[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 98-5266 & 98-5387
_____

D. C. Docket No.   97-1827-CV-EBD

AMERICAN BANKERS INSURANCE COMPANY OF FLORIDA,

Plaintiff-Counter-Defendant-
Appellee,

versus

NORTHWESTERN NATIONAL INSURANCE COMPANY,

Defendant-Counter-Claimant-Appellant.

_____

No. 99-4195
_____

D. C. Docket No.   97-1827-CV-EBD

AMERICAN BANKERS INSURANCE COMPANY OF FLORIDA,

Plaintiff-Counter-Defendant-Appellee-Cross-Appellant,

versus

NORTHWESTERN NATIONAL INSURANCE COMPANY,

Defendant-Counter-Claimant-Appellant-Cross-Appellee.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(December 30, 1999)**

Before EDMONDSON, BARKETT, Circuit Judges and COHILL[*], Senior District Judge.

BARKETT, Circuit Judge:

Northwestern National Insurance Company ("Northwestern") appeals from an adverse summary judgment in favor of American Bankers Insurance Company of Florida ("American Bankers") on American Bankers' suit to enforce the reinsurance contract between the parties.[1] Northwestern seeks a reversal of the district court's judgment, and a grant of summary judgment in its favor declaring that Northwestern has no liability under the insurance contract, or alternatively, a reversal of the district court's determination of the prejudgment interest amount in the amended final judgment.

## Background

This case involves the reinsurance contract between Northwestern and American Bankers to indemnify payments originally made by Hartford Insurance Company ("Hartford") to Dow Corning Corporation ("Dow") under Hartford's

---

[*] Honorable Maurice B. Cohill, Jr., Senior U.S. District Judge for the Western District of Pennsylvania, sitting by designation.

[1] A reinsurance contract provides that one insurer (the "ceding insurer" or "reinsured") "cedes" all or part of the risk it underwrites, pursuant to a policy or group of policies, to another insurer. The reinsurer agrees to indemnify the ceding insurer on the transferred risk. The purpose of the reinsurance contract is to diversify the risk of loss, and to reduce required capital reserves. See 13A John A. Appleman & Jean Appleman, Insurance Law and Practice §§ 7681, at 480 (1976); 19 George J. Couch, Cyclopedia of Insurance Law §§ 80:1, at 624 *et seq.* (2d ed. 1983).

primary insurance policy with Dow.  These payments satisfied personal injury claims asserted against Dow by women who had received silicone breast implants.

Dow was directly insured by Hartford through two policies: (1) a comprehensive general liability policy of $1 million on a "per occurrence" basis, subject to a $50,000 deductible; and (2) additional coverage on an "aggregate" basis, providing that any number of occurrences could be combined up to the $1 million policy limit, subject to a $500,000 deductible.

In order to spread its risk under this policy, Hartford purchased reinsurance protection from American Bankers for the per occurrence policy.  It chose not to reinsure the aggregate basis policy.  Under American Bankers' reinsurance contract with Hartford, American Bankers agreed to accept 30 percent of Hartford's liability up to $225,000 for any per occurrence loss exceeding $250,000. American Bankers in turn sought to spread its risk by purchasing reinsurance and contracted with Northwestern for this purpose.  Under this contract, Northwestern agreed to accept 92.3 percent of American Bankers' exposure to Hartford up to $224,500 for any per occurrence loss greater than $225,000.

Between October 24, 1994 and March 28, 1995, Hartford paid Dow's claims, and then submitted bills to American Bankers which American Bankers paid.  American Bankers subsequently billed Northwestern for its share of the

payments under their contract. After paying the initial claims submitted to them by American Bankers, Northwestern objected to the billing on the basis that American Bankers had not acted reasonably in paying Hartford's claims. Northwestern asserted that although Hartford made payments to Dow on an aggregate basis, it billed American Bankers on a per occurrence basis, which would not have been covered by the reinsurance contracts. Northwestern took the position that American Bankers failed to investigate adequately and should not have paid Hartford's claims.

After Northwestern refused to make any further payments, American Bankers filed this suit to enforce the reinsurance contract. Northwestern counterclaimed for the return of payments it had already made and sought a declaration that Northwestern had no obligation to American Bankers under their contract. The district court granted summary judgment to American Bankers and denied Northwestern's cross-motion for summary judgment. Northwestern now appeals. We review a district court's grant of summary judgment *de novo*, applying the same standards utilized by the district court, and viewing the evidence in the light most favorable to the party against whom judgment was granted. Squish La Fish, Inc. v. Thomco Specialty Prods., Inc., 149 F.3d 1288, 1290 (11th Cir. 1998).

**Discussion**

In this case, American Bankers seeks to enforce the reinsurance contract between the parties while Northwestern seeks a declaration that it has no obligations under the contract. Thus, our starting point is the language of the contract in order to ascertain its terms and determine whether it has been breached. The relevant language in the contract at issue is as follows:

> All claims involving this reinsurance when settled by the
> Company, shall be binding on the Reinsurer, which shall
> be bound to pay its proportion of such settlements . . . .

American Bankers contends that under this provision of the contract Northwestern cannot "second-guess" its decisions to pay claims and must defer to American Bankers' judgment. Northwestern argues that although this may be true generally, Northwestern is not obligated to defer to American Bankers' judgments where, as here, American Bankers did not fulfill its obligation to act in good faith.

When faced with reviewing the terms of a reinsurance contract, courts have recognized that the parties to these particular contracts are sophisticated companies regularly involved in bargaining on an equal footing. Both parties to this relationship are experts in the subject around which their relationship centers. Moreover, reinsurance contracts themselves are sophisticated documents. The Second Circuit has succinctly explained the nature of the reinsurance contract and

5

the pragmatic derivations of the need both to defer to the decisions of the ceding insurance company, but at the same time, to require good faith in the making of those decisions:

> Reinsurance involves contracts of indemnity, not liability.  Reinsurers do not examine risks, receive notice of loss from the original insured, or investigate claims. In practice, the reinsurer has no contact with the insured.  . . .  The reinsurance relationship is often characterized as one of "utmost good faith."  This utmost good faith may be viewed as a legal rule but also as a tradition honored by ceding insurers and reinsurers in their ongoing commercial relationships. Historically, the reinsurance market has relied on a practice of the exercise of utmost good faith to decrease monitoring costs and ex ante contracting costs. . . . [R]einsurers cannot duplicate the costly but necessary efforts of the primary insurer in evaluating risks and handling claims. Reinsurers may thus not have actuarial expertise . . . in defending ordinary claims. They are protected, however, by a large area of common interest with ceding insurers and by the tradition of utmost good faith.

Unigard Sec. Ins. Co. v. North River Ins. Co., 4 F.3d 1049, 1054 (2d Cir. 1993) (citations omitted).  The relationship of these reinsurance contracts and companies leads to the principle that reinsurers are generally bound by the reinsured's decision to pay the claim and must refrain from second guessing a good faith decision to do so.  See Henry T. Kramer, The Nature of Reinsurance, in Reinsurance 1, 5 (R.W. Strain ed., 1980); Christiania Gen. Ins. Corp. v. Great Am. Ins. Co., 979 F.2d 268, 280 (2d Cir. 1992) ("A reinsurer cannot second guess  the good faith liability determinations made by its reinsured . . . .").

6

The contractual articulation of this general principle has been called the "follow the fortunes" clause in reinsurance certificates or contracts. As it does in this case, the clause usually states that when an insurer loses to -- or settles with -- the insured, the reinsurer must "follow the fortunes" of the ceding company and pay on its reinsurance obligations. The Third Circuit has noted the compelling policy reasons that counsel against *de novo* review of the insured's decision to pay under the "follow the fortunes" doctrine:

> To permit the reinsurer to revisit coverage issues resolved between the insurer and its insured would place insurers in the untenable position of advancing defenses in coverage contests that would be used against them by reinsurers seeking to deny coverage. . . . Were the Court to conduct a *de novo* review of [the insurer's] decision-making process, the foundation of the cedent-reinsurer relationship would be forever damaged. The goals of maximum coverage and settlement that have been long established would give way to a proliferation of litigation. Cedents faced with *de novo* review of their claims determinations would ultimately litigate every coverage issue before making any attempt at settlement.

North River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1206 (3rd Cir. 1995) (citations omitted).

This is not to say that there are no limitations to this doctrine. A court must still ask whether the ceding insurer acted in good faith in settling or paying the claims. This in turn requires that we determine what constitutes good faith in this context. We are persuaded that simple negligence cannot be enough to establish

bad faith. Virtually every decision by the ceding insurance company could be second-guessed and litigated under a simple negligence standard. Thus, to equate bad faith with simple negligence would vitiate all of the policy reasons that give rise to the follow the fortunes doctrine. Rather, we agree with the Second Circuit that the proper minimum standard for bad faith should be deliberate deception, gross negligence or recklessness. See Unigard, 4 F.3d at 1069; see also North River, 52 F.3d at 1216 ("As we have noted, bad faith requires an extraordinary showing of a disingenuous or dishonest failure to carry out a contract. The standard is not mere negligence, but gross negligence or recklessness. "); id. at 1207 ("'[F]ollow the fortunes' doctrine requires a court to find reinsurance coverage unless the reinsurer demonstrates the liability to the insured was the result of fraud and collusion or not reasonably within the scope of the original policy.").

In this case, Northwestern argues that Hartford submitted a false claim to American Bankers which American Bankers then paid as a result of its failure to investigate. Specifically, Northwestern asserts that Hartford paid Dow for multiple claims under its aggregate policy, but treated all of the claims as a single occurrence for purposes of presenting them to American Bankers, its reinsurers. Northwestern argues that American Bankers should have investigated and determined that Hartford's claims were not covered by the reinsurance contract

8

between Hartford and American Bankers and, therefore, not covered by the reinsurance contract between American Bankers and Northwestern.

American Bankers responds that it acted appropriately in evaluating and paying Harthord's claims. It points out that the reinsurance contract defines "occurrence" to mean "an accident, event or happening, including continuous or repeated exposure to conditions, which results in bodily injury . . . .[,]" and that Hartford's policy provides that:

> $50,000 shall be deducted from the aggregate amount of all sums which the Company shall be obligated to pay as (a) damages . . . with respect to all insurance afforded by the policy as the result of Bodily Injury . . . arising out of any one occurrence.

American Bankers argues that at the time of its decision there was legitimate debate about whether a large group of similar claims were the result of a single occurrence or multiple occurrences. See Barry R. Ostrager & Thomas R. Newman, Insurance Coverage Disputes §9.02 (8th ed. 1995). American Bankers points out that courts had held that many claims may constitute a single occurrence in the context of massive toxic tort losses, and where multiple claims constitute a single occurrence, single occurrence based coverage operates in a manner similar to aggregate coverage. Hartford's bills were presented on the basis that all of the auto-immune breast implant claims constituted a single occurrence. American Bankers maintains that, in good faith, it determined that it should pay those claims.

9

We agree with American Bankers that Northwestern's contention that the reinsurance contracts provided only for per occurrence coverage merely begs the question of whether the claims constituted a single occurrence or multiple occurrences. Under the state of the law [2] at the time of the submission of Hartford's claim for payment, we cannot say that American Bankers acted in a grossly negligent or reckless manner in accepting or paying those claims. American Bankers was, in fact, "following the fortunes" of its ceding insurance company, Hartford. Nor is there anything in the record to support a claim that American Bankers acted in a fraudulent or deliberately deceptive or grossly negligent manner.

We are not persuaded that the after the fact determination by Hartford that it had erroneously billed American Bankers makes a difference to our decision.[3] To

---

[2] See, e.g., Uniroyal, Inc. v. Home Insurance Co., 707 F. Supp. 1368, 1380-87 (E.D.N.Y. 1988) (Agent Orange); Owens-Illinois, Inc. v. Aetna Casualty and Surety Co., 597 F. Supp. 1515, 1527-28 (D.D.C. 1984) (asbestos); Owens-Illinois, Inc. v. United Insurance Co., 264 N.J. Super. 460, 498-503, 625 A.2d 1, 21-23 (N.J. App. Div. 1993), aff'd in part, rev'd in part, 138 N.J. 437, 650 A.2d 974 (1994) (asbestos); Insurance Coverage Disputes §9.02. See also International Surplus Lines Insurance Co. v. Certain Underwriters at Lloyd's, 868 F. Supp. 917, 921 (S.D. Ohio 1994) (reinsurer could not challenge the single occurrence basis on which the ceding company had paid the asbestos claims presented by its insured).

[3] Subsequent to American Bankers' payments to Hartford on its reinsurance contract, Hartford advised American Bankers that it had erroneously overbilled American Bankers. Hartford explained that it believed that the aggregate deductible issued to Dow had already been exhausted by previous claims. Because the deductible actually had not been exhausted, "[H]artford has amended its bills to allow the unexhausted portion of the aggregate deductible . . . to respond as if on a per claim basis." Hartford concluded that American Bankers should have

10

determine whether a decision is made in good faith, we must look to the circumstances at the time of the decision. The question is not whether Hartford or American Bankers were ultimately correct or incorrect, but whether they acted in good faith at the time. Under the facts in the record, we conclude that the district court did not err in determining that American Bankers was entitled to recover on its reinsurance contract.

As to Northwestern's second appeal seeking reversal of the district court's ruling on prejudgment interest, we likewise affirm. The issue of prejudgment interest was litigated as part of the original case. During the litigation, American Bankers argued that prejudgment interest should be calculated from the date on which each bill was approved for payment by Northwestern's claims department to July 27, 1998. Northwestern, by motion, opposed American Bankers' method of calculating prejudgment interest, arguing that under Florida law prejudgment interest should run from the time the cause of action accrues. The district court rejected Northwestern's argument and its final judgment reflected the prejudgment interest as sought by American Bankers. Northwestern's notice of appeal from this

---

been billed a total of $1,054,955.21, rather than $1,803,836.29. The difference of $748,881.08 was refunded to American Bankers and the appropriate percentage of overbilling was likewise refunded to Northwestern. The district court subsequently amended its final judgment, reducing American Bankers' recovery.

11

judgment, case numbers 98-5266 and 98-5387, did not raise any issue pertaining to prejudgment interest.

Two months after the final judgment had been entered, and after Northwestern's notice of appeal had been filed, Hartford notified the parties of its billing error. See note 3 supra. Northwestern filed a motion pursuant to Rule 60(b) of the Federal Rules of Civil Procedure[4] to vacate the judgment on the ground of "newly discovered evidence." The district court granted Northwestern's motion only for the purpose of appropriately computing the amount owed to American Bankers by Northwestern in light of Hartford's refunds. The district court specifically noted that:

---

[4] Rule 60(b) provides in part:

On motion and upon such terms as are just, the court may relieve a party or [his] legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken.

Fed.R.Civ.P. 60(b).

12

> this Court granted the Rule 60 motion only to the extent necessary to adjust the final judgment amount. No other aspect of the court's original final judgment is under review or subject to reconsideration. Appellate-leave would only serve to unnecessarily delay the correction of a simple matter which has little bearing, if any, on the liability issues on appeal.

American Bankers v. Northwestern, No. 97-1827 (S.D. Fla. Nov. 17, 1998).

Northwestern filed a notice of appeal from the amended final judgment (i) reiterating its position regarding American Bankers' decision to pay Hartford's claims, and (ii) appealing the district court's ruling regarding the calculation of prejudgment interest. Having resolved the contractual issue, the question remaining is the calculation of prejudgment interest.

Before we can address the merits of this question, however, we must address American Banker's contention that Northwestern's argument in this regard is untimely. An order granting or denying relief under Rule 60(b) is final and appealable. 7 J. Moore's Federal Practice, para. 60.30[3], at 60-343. An appeal of a ruling on a Rule 60(b) motion, however, is narrow in scope, addressing only the propriety of the denial or grant of relief and does not raise issues in the underlying judgment for review. See Browder v. Director, Dep't of Corrections, 434 U.S. 257, 263 n.7 (1978). Because of this limitation, the law is clear that Rule 60(b) may not be used to challenge mistakes of law which could have been raised on direct

13

appeal. <u>Gulf Coast Fans, Inc. v. Midwest Electronics Importers</u>, 740 F.2d 1499, 1507 (11th Cir. 1984) ("Rule 60(b) does not extend the time for filing a notice of appeal."). Moreover, a district court's order under Rule 60(b) is reviewable only for abuse of discretion. <u>Browder</u>, 434 U.S. at 263; <u>Gulf Coast Fans</u>, 740 F.2d at 1510.

Both the original and final amended judgment calculate the prejudgment interest in the same way, running from the date on which each of the three bills at issue was approved by Northwestern. While Northwestern objected to this manner of calculation before the final judgment, it never mentioned it in its briefs on direct appeal. Given that this issue was litigated before the original final judgment, Northwestern cannot now raise the issue in its subsequent appeal from the district court's grant of relief under Rule 60(b). Thus, we agree that Northwestern's argument regarding prejudgment interest is untimely. For all the foregoing reasons the judgments of the district court are

AFFIRMED.