# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-3287

_____

| | | |
|---|---|---|
| ReliaStar Life Insurance Company, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | |
| | * | Appeal from the United States |
| IOA Re, Inc.; Swiss Re Life Canada, | * | District Court for the |
| | * | District of Minnesota. |
| Appellants. | * | |
| | * | |
| ------------------------------- | * | |
| | * | |
| The Reinsurance Association, | * | |
| | * | |
| Amicus on Behalf of Appellants. | * | |

_____

Submitted: June 13, 2002

Filed: September 9, 2002

_____

Before HANSEN, Chief Judge, FAGG, and BOWMAN, Circuit Judges.

_____

BOWMAN, Circuit Judge.

ReliaStar Life Insurance Company sued IOA Re, Inc. and Swiss Re Life Canada (collectively, the retrocessionaires) for breach of contract arising out of an alleged failure to pay under reinsurance contracts. IOA Re and Swiss Re counterclaimed, alleging that they were entitled to rescind the reinsurance contracts,

and that in any case ReliaStar committed a breach of contract by failing to remit premiums to the retrocessionaires. The parties filed cross-motions for summary judgment in the District Court,[1] and the court denied the retrocessionaires' motion for partial summary judgment and granted ReliaStar's motion for summary judgment. The retrocessionaires appeal. We affirm, but remand for clarification of one issue related to the District Court's award of damages to ReliaStar.

## I.

ReliaStar is a reinsurance company based in Minnesota. For the 1996 to 1997 policy year, ReliaStar reinsured the risk of Canada Life Assurance Company on a product commonly called "snowbird" insurance. This type of insurance provides "short-term medical insurance for individual Canadians traveling out of their home provinces [including out of country], where Canadian provincial medical coverage did not extend." Br. of Plaintiff-Appellee at 3. Canada Life ceded to ReliaStar its risk for seventy-five percent of the first $100,000 (Canadian) of each claim under the program; in exchange, ReliaStar was to receive seventy-five percent of the net premium collected.[2] This variety of risk sharing is known as a quota-share arrangement.

ReliaStar then sought to spread the risk ceded to it by Canada Life through quota-share reinsurance from IOA Re, a Delaware corporation, and Swiss Re, a Canadian company. Reinsurers of a reinsurer, such as IOA Re and Swiss Re in this

---

[1]The Honorable James M. Rosenbaum, Chief Judge, United States District Court for the District of Minnesota.

[2]For reasons not made clear to this Court, the formal written reinsurance contract between ReliaStar and Canada Life was not executed until January 30, 1998. According to ReliaStar, this is not an uncommon practice in the reinsurance industry. Br. of Plaintiff-Appellee at 10 n.7.

case, are known in the industry as retrocessionaires, and the coverage they provide is known as retrocessional coverage. Swiss Re's participation was arranged through a company called Reinsurance Management Associates (RMA), a managing general underwriter which "accepted risk and performed various administrative and management functions for insurance carrier clients." Br. of Plaintiff-Appellee at 6. Swiss Re issued a retrocessional placement slip for this coverage sometime in December 1996, and ReliaStar ceded one-third of its exposure under the Canada Life reinsurance policy (amounting to twenty-five percent of the total insurance liability of Canada Life) to Swiss Re. In return, Swiss Re was to receive twenty-five percent of the net premium collected by Canada Life.

IOA Re is also a managing general underwriter, and it accepted the retrocessional coverage from ReliaStar on behalf of the pool of other companies for which IOA Re provided services. Answer and Counterclaim of Defendants at 3. IOA Re signed a retrocessional placement slip for this coverage in early 1997, also assuming one-third of ReliaStar's liability in exchange for twenty-five percent of the net premium collected.

The snowbird insurance program for the 1996 to 1997 policy period paid out more than expected on claims and ended in a loss position. Before the end of the policy period, Canada Life began to bill losses to ReliaStar that exceeded the net premiums paid to ReliaStar. On October 2, 1997, ReliaStar submitted the first bills to the retrocessionaires for their portion of the losses. ReliaStar submitted these losses for payment despite the fact that it had not forwarded any premium payments to either retrocessionaire. ReliaStar maintains that it deducted the net premium payments to which the retrocessionaires were entitled from the amount of losses billed to them.

In November 1998, IOA Re notified ReliaStar that it was "canceling the Certificate of Reinsurance" and "rescinding the retrocessional coverage therein," for

reasons that included non-payment of premium and failure to provide requested documentation of claims. Letter from Walter A. Dorosz, Chief Operating/Audit Officer, IOA Re, Inc., to Stephen J. Dvorak, Director of Reinsurance, ReliaStar Reinsurance Group (Nov. 11, 1998). Swiss Re, although it had reconfirmed its intention to pay in a May 1998 fax to ReliaStar, similarly refused to make any payments to ReliaStar, and eventually claimed that they owed no payment to ReliaStar. Br. of Plaintiff-Appellee at 13.

ReliaStar filed this diversity action in December 1999, bringing breach of contract claims under Minnesota law against the retrocessionaires for failure to pay under the retrocessional contracts. The District Court, on cross-motions for summary judgment, held that ReliaStar was entitled to judgment as a matter of law on its breach of retrocession contract claims. The District Court awarded ReliaStar $2,606,684 (Canadian) from each defendant for the amounts ReliaStar paid to Canada Life, and awarded ReliaStar $541,779 from each defendant based on ReliaStar's evidence of lost investment income attributable to the retrocessionaires' refusal to pay. The court ordered the retrocessionaires to pay the judgment in U.S. dollars at the currency exchange rate as of the date the retrocessionaires first refused to pay the losses billed to them on October 2, 1997.

II.

Reinsurance relationships are governed by the traditional principle of "utmost good faith." Unigard Sec. Ins. Co. v. N. River Ins. Co., 4 F.3d 1049, 1054 (2d Cir. 1993). The duty of good faith is essential to the industry, inasmuch as "[r]einsurers depend on ceding insurers to provide information concerning potential liability on the underlying policies." Travelers Indem. Co. v. Scor Reinsurance Co., 62 F.3d 74, 76 (2d Cir. 1995). Reinsurers must rely on this principle because they generally do not duplicate the functions of the ceding insurers, such as evaluating risks and processing

claims.  <u>Unigard</u>, 4 F.3d at 1054.  To arrange their business otherwise would result in greatly increased costs for both reinsurance and the underlying policies themselves.

Flowing from this duty of good faith is a doctrine, widely recognized in the insurance industry, known as the "follow-the-fortunes" doctrine.  Essentially, this doctrine posits that if the cedent has acted in good faith in handling the claims presented to it and in providing coverage of the claims, "the reinsurer may not second guess the coverage decisions of the cedent."   Br. of Appellants at 22; <u>see also, e.g.</u>, <u>Am. Bankers Ins. Co. v. Northwestern Nat'l Ins. Co.</u>, 198 F.3d 1332, 1335 (11th Cir. 1999).[3]

The District Court, applying the follow-the-fortunes doctrine to the contracts at issue, held that ReliaStar had fulfilled its obligations under the contracts because it had not acted in bad faith, with gross negligence, or recklessly in paying the losses billed to it by Canada Life and in subsequently billing an appropriate portion of those losses to the retrocessionaires.  The retrocessionaires take issue with the District Court's conclusion.  They argue that their retrocessional contracts with ReliaStar expressly denied the application of the follow-the-fortunes doctrine.  Moreover, they claim that the factual record contains "substantial material evidence of ReliaStar's gross negligence and recklessness in its claims handling processes, as well as

---

[3]We note that the case law and the analysis of certain scholarly works disagree as to the exact scope and meaning of the "follow-the-fortunes" doctrine.  <u>Compare</u> <u>Am. Bankers Ins. Co. v. Northwest Nat'l Ins. Co.</u>, 198 F.3d 1332, 1335 (11th Cir. 1999) (explaining that follow-the-fortunes doctrine requires reinsurer to generally be "bound by the reinsured's decision to pay the claim and must refrain from second guessing a good faith decision to do so") <u>with</u> Graydon S. Staring, <u>Law of Reinsurance</u> § 18:1 (1993) (noting that some courts have confused following fortunes with following settlements doctrine).  Because the retrocessionaires agree with ReliaStar as to the nature of the doctrine as it may apply to them, and disagree only as to whether they have written it out of their insurance contracts, we do not endeavor to resolve the ambiguities noted in these sources.

significant evidence that ReliaStar had misrepresented the nature of the underlying insurance program." Br. of Appellants at i. In addition, they argue that the District Court erred in converting the damages award to U.S. dollars and in failing to clearly identify the applicable exchange rate for such a conversion.

We review a district court's grant or denial of a summary judgment motion de novo, applying the same standards that governed the district court's decision. Jaurequi v. Carter Mfg. Co., 173 F.3d 1076, 1085 (8th Cir. 1999). Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

## III.

IOA Re and Swiss Re first find error in the District Court's rejection of their claim that they were entitled to rescind the retrocessional coverage they provided to ReliaStar because ReliaStar induced IOA Re and Swiss Re to enter the arrangements through misrepresentation. The District Court held that ReliaStar had not misrepresented any material fact and that IOA Re and Swiss Re therefore were not entitled to rescind their retrocessional coverage.

The usual rules of contract law apply to our examination of reinsurance contracts. Under Minnesota law,[4] "[o]ne who has been induced to enter a contract by fraudulent misrepresentations may elect to rescind the contract." Anders v. Dakota Land & Dev. Co., 289 N.W.2d 161, 163 (Minn. 1980). IOA Re and Swiss Re argue that ReliaStar failed to disclose or misrepresented to them various facts and thus they are permitted to rescind the retrocessional coverage they agreed to provide. They

---

[4]The District Court applied Minnesota law to the substantive issues in the case. Neither party contends that the law of some other jurisdiction should govern the case and therefore we have no need to explore any choice-of-law question.

argue that the record contains "substantial evidence supporting their right to rescind the contract." Br. of Appellants at 20.

Upon careful examination of the record, we must disagree. The alleged "substantial evidence" cited by the retrocessionaires fails to adequately support their rescission claim. For example, IOA and Swiss argue that ReliaStar knew the snowbird program would be a "losing proposition" but failed to disclose this to either retrocessionaire. The portions of the record they cite to do not, however, support this assertion. In fact, in deposition testimony the retrocessionaires claim supports their argument, the witness admits that to his knowledge ReliaStar *did not know* the insurance was going to be in a loss position at the time that statements about the program's profitability were made to IOA Re and Swiss Re personnel. Joint App. Vol. IV at A1385. The evidence cited in support of the other supposed misrepresentations, taken in the light most favorable to IOA Re and Swiss Re, also does not sustain the retrocessionaires' position. Their citations to the record do not point to any specific instances where ReliaStar, at the time it solicited reinsurance coverage from IOA Re and Swiss Re, misrepresented material facts regarding the snowbird insurance program. See S. Sur. Co. v. Fid. & Cas. Co., 50 F.2d 16, 19 (8th Cir. 1931) (holding that promise of insured as to what would happen in the future "was not a representation of a present fact or condition" and therefore "could not form the basis of a claim of false or fraudulent representations"). We cannot see how this evidence could be construed, even in the most generous light, as constituting misrepresentations made by ReliaStar to either of the retrocessionaires. Cf. Sec. Mut. Cas. Co. v. Affiliated FM Ins. Co., 471 F.2d 238, 245-46 (8th Cir. 1972) (holding that substantial evidence of material misrepresentations supported jury verdict where defendant, at the time defendant sought reinsurance from plaintiff, hid from reinsurer the dangerous nature of the insured's business, affirmatively misstated the insured's previous loss history, and did not reveal the nature of the underlying insurance). The District Court rightly concluded that the retrocessionaires failed, as a matter of law, to put forth sufficient evidence in support of their claims to survive summary

judgment on the question of whether the retrocessionaires had the right to rescind their contracts with ReliaStar on the basis of material misrepresentations.

## III.

IOA and Swiss Re next argue that the District Court erroneously applied the follow-the-fortunes doctrine to the facts of this case. The District Court held that the doctrine "requires a reinsurer to follow-the-fortunes [sic] of the ceding company and pay all reinsurance obligations." Joint App. Vol. V at A1813 (citing Am. Bankers Ins., 198 F.3d at 1335; Nat'l Am. Ins. Co. v. Certain Underwriters at Lloyd's London, 93 F.3d 529 (9th Cir. 1996); Aetna Cas. & Sur. Co. v. Home Ins. Co., 882 F. Supp. 1328, 1346-47 (S.D.N.Y. 1995)). IOA and Swiss Re contend that the terms of their reinsurance contracts with ReliaStar "required strict proof of the claims paid by ReliaStar" and therefore the contracts did not incorporate the customary follow-the-fortunes doctrine. Br. of Appellants at 22. They contend that their reinsurance contracts "incorporated the terms and conditions of the underlying reinsurance contract which required strict proof of coverage" and thus that under the terms of their contracts the follow-the-fortunes doctrine does not apply to their retrocessional coverage of ReliaStar's risk. Id. at 23.

The District Court rejected the argument that the retrocessional agreements incorporate any limiting language that might be found in the Canada Life/ReliaStar reinsurance agreement. The court concluded that IOA Re and Swiss Re failed to introduce any evidence "indicating that ReliaStar consented to adopting the limitations included in the reinsurance contract between Canada Life and ReliaStar." Joint App. Vol. V at A1818. The court explained that the retrocessional placement slips merely identify the "pertinent insurance contract." Id.

Under Minnesota law, construction of a contract, including deciding whether it is ambiguous, is a legal determination. Kauffman Stewart, Inc. v. Weinbrenner Shoe Co., 589 N.W.2d 499, 501 (Minn. Ct. App. 1999). If after examining the entire contract it is not subject to more than one reasonable interpretation, then there is no ambiguity. Columbia Heights Motors, Inc. v. Allstate Ins. Co., 275 N.W.2d 32, 34 (Minn. 1979); In re Info Tel Communications, LLC v. U.S. WEST Communications, Inc., 592 N.W.2d 880, 884 (Minn. Ct. App. 1999). We give the policy terms "their plain, ordinary, and popular meaning," Ostendorf v. Arrow Ins. Co., 182 N.W.2d 190, 192 (Minn. 1970), without resort to parol evidence, ICC Leasing Corp. v. Midwestern Machinery Co., 257 N.W.2d 551, 554 (Minn. 1977). See generally LaSociete Generale Immobiliere v. Minneapolis Cmty. Dev. Agency, 44 F.3d 629, 635-36 (8th Cir. 1994), cert. denied, 516 U.S. 810 (1995).

IOA Re and Swiss Re rely on affidavits from their employees that state they understood that the underlying Canada Life/ReliaStar agreement would "form a part of the retrocessional agreement." Joint App. Vol. III at A1016, A1018. This "understanding" is not sufficient as a matter of law to create ambiguity in the contract and thus create a material issue of fact precluding summary judgment on this issue. Looking to the plain language of the reinsurance agreements, we fail to see any ambiguity in the contract terms. The retrocessionaires seize upon language in the retrocessional placement slips that states, "Conditions: See attached ETFS Travel Health Medical Reinsurance Agreement," to argue that the retrocession contracts incorporated the loss notice and settlement procedures agreed to between Canada Life and ReliaStar. Id. at A1103, A1105; Br. of Appellants at 24. We disagree. The plain purpose of these slips is to set out the parties to the retrocession agreement, the period of coverage, and the coverage that the retrocessionaire is to provide, among other details. These other details include identifying the portion of the insured risk that is being ceded to the retrocessionaire. Taken as a whole, the language of these slips, and in particular the conditions clause, cannot reasonably be interpreted as sweeping under its scope a set of specific procedures agreed to between Canada Life and

ReliaStar in a separate agreement to which neither of the retrocessionaires were a party. See Short v. Van Dyke, 52 N.W. 643, 644 (Minn. 1892) (holding that under Minnesota law, if the reference to another contract or writing in the contract at issue is "made for a particular purpose, expressed in the contract, it becomes part of it only for that purpose"). The language in question certainly does not make explicit that the retrocessional contract incorporates those specific terms. Cf. Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela, 991 F.2d 42, 46 (2d Cir. 1993) (holding that language "Subject to Facultative Reinsurance Agreement [FRA]" is sufficient to incorporate FRA arbitration clause into reinsurance policy). We conclude that the loss settlement procedures of the underlying insurance policy did not form part of the operative terms of the retrocessional contracts at issue. Thus, we reject the argument that the parties entered into any express contractual undertakings, as between the retrocessionaires and ReliaStar, to preempt application of the customary follow-the-fortunes doctrine.

The retrocessionaires further challenge the District Court's application of the follow-the-fortunes doctrine to this case because they claim that the existence of an industry custom is a question of fact that should be left to a jury. We note that the record does not reflect any dispute between the two sides as to the existence of this custom. To the contrary, the retrocessionaires' expert admits that "[a] reinsurer has the duty to 'follow the fortunes' of the cedent or retrocedent as long as the losses paid are covered under the underlying contract or policy and fall within the terms and conditions of the reinsurance treaty." Expert Report of James W. Schacht at 6. He further agrees that the "follow-the-fortunes" obligation is "customary with reinsurance contracts." Id. at 12. He explains that this custom applies unless "the reinsured has not dealt with the reinsurer or retrocessionaire in the 'utmost good faith' [or] . . . the reinsured fails to prove reinsured losses." Id. at 13. ReliaStar's expert agrees that follow-the-fortunes is a "key principle[]" of the reinsurance business, and means "when the ceding company has paid claims in good faith, the reinsurer may not second guess such payment but must fulfill its own payment obligations." Expert

Report of Ronald L. Wobbeking at 6. Thus, there does not appear to be a dispute between the parties as to the nature of the follow-the-fortunes doctrine and as to its customary application in the reinsurance business. The real dispute appears to be whether the language of the parties' contracts rendered this industry custom inapplicable to their insurance arrangement. Having concluded that the contracts did not contain "anti-follow-the-fortunes" provisions, the District Court, we believe, was correct to apply the customary follow-the-fortunes doctrine to the dispute at hand.

The retrocessionaires next argue that if the follow-the-fortunes doctrine applies to them, then the District Court erred in concluding that ReliaStar had not acted in bad faith, because ReliaStar had not shown it "acted in a reasonable, businesslike fashion, and that it submitted legitimate, reinsured losses." Br. of Appellants at 28. They contend that the District Court erred in interpreting "bad faith" to require proof of "deliberate deception, gross negligence, or recklessness," or even fraudulent behavior. Id.

In American Bankers Insurance v. Northwestern National Insurance, the Eleventh Circuit discussed the question of what constitutes good faith in the context of a ceding insurer's payment or settlement of claims. American Bankers, 198 F.3d at 1336. In that case, the court concluded that "simple negligence cannot be enough to establish bad faith," because otherwise "every decision by the ceding insurance company could be second-guessed and litigated under a simple negligence standard." Id. The court therefore concluded "that the proper minimum standard for bad faith should be deliberate deception, gross negligence or recklessness." See id.; accord Unigard, 4 F.3d at 1069. One court has even described this standard as requiring "an extraordinary showing of a disingenuous or dishonest failure to carry out a contract." North River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1216 (3d Cir. 1995). We agree with the formulation of "bad faith" adopted by other circuits in the just-cited cases, and we adopt the same standard as our own. We therefore hold that the

District Court did not err in applying this standard to the "bad faith" question in this case.

Moreover and despite IOA Re's and Swiss Re's arguments to the contrary, a thorough review of the record convinces us that the retrocessionaires have not presented evidence sufficient to make a submissible case on their allegations of bad faith. The record reflects problems with the snowbird insurance program and with the claims documentation (as noted in the IIAS audit report), among other issues. It also reflects efforts by ReliaStar to provide information to the retrocessionaires and to determine how it could change the snowbird program to prevent similar losses in future policy terms. We conclude that, as a matter of law, the evidence the retrocessionaires point to does not amount to evidence of "deliberate deception, gross negligence or recklessness." Summary judgment on this issue in favor of ReliaStar was appropriate.

Finally, the retrocessionaires argue that they are not obligated to pay ReliaStar's loss claims because ReliaStar failed to comply with the loss-notice and claims deadlines contained in the underlying insurance. Because we already have concluded that these terms were not incorporated into the retrocessional coverage contracts with IOA Re and Swiss Re, we conclude that summary judgment was appropriate on these disputed claims.

## IV.

The retrocessionaires raise several challenges to the damages awarded by the District Court to ReliaStar. They argue that any judgment in favor of ReliaStar must be awarded in Canadian dollars, because that is "the currency in which the parties chose to do business." Br. of Appellants at 35. Moreover, they argue that if ordering the award in U.S. dollars is appropriate, the District Court erroneously failed to state a specific rate of exchange at which to determine the amount of the award.

The District Court held that awards in actions "involving foreign currency must be rendered in U.S. currency." The court relied on the Supreme Court's decision in Hicks v. Guinness, 269 U.S. 71, 80 (1925), which held that when a debt is due and is to be paid in the United States, the breaching debtor can be made to pay the debt in U.S. dollars as of the time the breach occurred. We believe the District Court may have somewhat overread Hicks. We infer from the Supreme Court's discussion in Hicks that such awards *may* be ordered to be paid in U.S. dollars, if the plaintiff so requests (as ReliaStar here apparently did), but that a district court is not required to order the award to be paid in U.S. currency. Our reading of Hicks is supported further by the position stated in the Restatement (Third) of Foreign Relations Law, which suggests that United States courts ordinarily enter judgments in U.S. dollars, but that nothing precludes a United States court from entering judgment in a foreign currency. See Restatement (Third) of Foreign Relations Law § 823 (1987). Based on these authorities, we conclude that although the District Court was not compelled to make the award in U.S. dollars, it nevertheless was not error to do so.

When a court makes an award in U.S. currency, "the conversion from foreign currency to dollars is to be made at such rate as to make the creditor whole and to avoid rewarding a debtor who has delayed in carrying out the obligation." Id. In this instance, the District Court concluded that to make ReliaStar whole, the award should be converted "at the rate of exchange at the time the defendants first refused to make the payment owed in October 1997." Joint App. Vol. V at A1820. The court again relied upon Hicks:

> When the contract was broken by a failure to pay, the American firm had a claim here, not for the debt, but, at its option, for damages in dollars. It no longer could be compelled to accept [foreign currency]. . . . The loss for which the plaintiff is entitled to be indemnified is "the loss of what the contractor would have had if the contract had been performed" . . . and the plaintiff's claim is for the amount of that loss valued in money at that time.

-13-

<u>Hicks</u>, 269 U.S. at 80 (alteration in original) (quoting <u>Chicago, Milwaukee & St. Paul Ry. Co. v. McCaull-Dinsmore Co.</u>, 253 U.S. 97, 100 (1920)).  The rule in <u>Hicks</u> is often referred to as the "breach day" rule.

The retrocessionaires argue for the application of a different rule.  They cite <u>Deutsche Bank Filiale Nurnberg v. Humphrey</u>, 272 U.S. 517, 519 (1926), in support of their argument that the District Court should have fixed the exchange rate as that applicable on September 14, 2001, the date on which the District Court entered judgment against them.  The Supreme Court held in <u>Deutsche Bank</u> that because the judgment was to be paid on an obligation incurred in a foreign currency in a foreign country, rate fluctuations in the meantime should not cause the court to award damages as of the date of breach.  <u>Id.</u> at 519-20.  We conclude the District Court correctly applied the rule in <u>Hicks</u>, rather than the rule in <u>Deutsche Bank</u>.  As the First Circuit has succinctly explained, "[t]he judgment day rule applies only when the obligation arises entirely under foreign law. If, however, at the time of breach the plaintiff has a cause of action arising in this country under American law, the breach day rule applies."  <u>In re Good Hope Chemical Corp.</u>, 747 F.2d 806, 811 (1st Cir. 1984), <u>cert. denied</u>, 471 U.S. 1102 (1985).  When IOA Re and Swiss Re failed to make their payments to ReliaStar, ReliaStar accrued a cause of action against them under Minnesota law for breach of contract.[5]  <u>See</u> <u>Olson v. Rugloski</u>, 277 N.W.2d 385, 387-88 (Minn. 1979).  Even though the retrocessionaires had in the past made payments to ReliaStar in Canadian dollars, that fact does not render the "breach day" rule inapplicable.  <u>See</u> <u>Hicks</u>, 269 U.S. at 80 (holding that even though payments under contract were to be made in German marks, at time of breach American company gained, as a matter of law, right to demand payment in U.S. currency).

---

[5]As pointed out in footnote 4, <u>supra</u>, IOA Re and Swiss Re do not contest the application of Minnesota law to the case.

Although we reject the retrocessionaires' argument that the "judgment day" rule should apply, we agree that the District Court did not make clear whether under the breach-day rule it meant to impose the exchange rate in effect on October 2, 1997, the date on which ReliaStar made its first demand for payment, or on some other date. Obviously, to apply the breach-day rule correctly, it is necessary to determine the day on which the breach in question occurred. Thus, we remand to the District Court for clarification of this point.

## VI.

For the reasons stated, we affirm the judgment of the District Court, and we remand for clarification as to the exchange rate applicable to the damages owed to ReliaStar by IOA Re and Swiss Re.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.