Sanders, Janet L., J.
The plaintiff, Lexington Insurance Company (“Lexington”), commenced this action against Clearwater Insurance (“Clearwater”), its rein-surer for two of Lexington’s insurance policies. Lexington alleges that Clearwater has breached these reinsurance contracts by failing to pay its share of the loss. The case is before the Court on Cross Motions for Summary Judgment. For the following reasons, this Court concludes that the plaintiffs motion should be Allowed and the defendant’s motion Denied.
BACKGROUND
The following facts are undisputed. Based on the longstanding manufacture and distribution of products containing asbestos and/or silica by Dresser Industries (“Dresser”) and its related entities, Dresser was named as a defendant in hundreds of thousands of complaints throughout the United States alleging bodily injury or death from exposure to or inhalation of asbestos and/or silica.
On February 14, 2002, Harbison-Walker, a Dresser affiliate, filed a bankruptcy petition in the United States Bankruptcy Court for the Western District of Pennsylvania seeking to discharge its asbestos liabilities.[1] In the bankruptcy case, Harbison-Walker commenced a declaratory judgment proceeding against Dresser and over one hundred insurers, including twenty-seven individual insurance companies described by Harbison-Walker as “domestic insurance companies.” Specifically, Harbison-Walker sought a determination regarding the insurance coverage for all of Dresser’s asbestos liability. Ultimately, Dresser took over these proceedings.
Among the 27 domestic insurance companies involved were a number of American International Group, Inc. (“AIG”) companies, including Lexington. Lexington had issued several policies to Dresser, including policies GC 5502513 and GC 5505740 (collectively, the “Lexington Policies”). These two Policies covered periods from November 1, 1976 to November 1, 1977 and November 1, 1977 to November 1, 1978, respectively. The Lexington Policies were part of a comprehensive annual insurance program known as a “coverage tower.” Each Policy provided excess liability insurance and coverage of $10 million as part of an insurance layer providing $25 million in excess of $75 million.
In conjunction with the Lexington Policies, Lexington held facultative reinsurance policies from Skandia America Reinsurance Corporation (“Skandia”), now known as the defendant Clearwater. Simply put, a reinsurance policy is a contract by which one insurer insures all or some portion of the risk of another insurer. At issue in this case are two reinsurance policies, N11052 and N21102 (collectively, the “Skan-dia Certificates”). They reinsured each of the Lexington Policies for “10% ($1,000,000) of the limit [$10,000,000]” on a pro rata basis. Accordingly, Skandia’s (now Clearwater’s) liability was for 10 percent of each dollar that Lexington paid on the Policy, up to each Policy limit of $10,000,000. In addition, the terms and conditions of each Skandia Certificate include the following provision:
Skandia’s liability under this Casualty Facultative Reinsurance Certificate shall follow the ceding Company’s (“Company”) liability in accordance with *520 the terms and conditions of the policy reinsured hereunder except with respect to those terms and/or conditions as may be inconsistent with the terms of this Certificate . . .
The parties dispute how to characterize this provision: Clearwater contends it is a “follow the form” clause whereas Lexington says it is a “follow the fortunes” provision (discussed infra). The parties’ characterization is immaterial, however.
On June 24, 2002, the Bankruptcy Court ordered the parties to the proceedings to confidential mediation, leading to two years of intensive negotiations between Dresser and its insurers. In mediation, Dresser estimated that its developing asbestos liabilities would ultimately reach between $2.2 billion and $3.5 billion. AIG’s own internal Complex Claim Unit adjusted the Dresser claims on behalf of all affected AIG companies, including Lexington. The Complex Claim Unit determined, either by its own analysis or by outside analysis, that Dresser’s liabilities exposed the full limits of coverage by the AIG companies to the probable loss and that the combined coverage limits of $551 million would likely be fully reached if the claims were resolved through litigation. As a result of circumstances presented in the ongoing bankruptcy proceedings, however, the Complex Claim Unit perceived an opportunity to negotiate a substantially discounted settlement on behalf of all of AIG’s companies. Perceiving the same thing, other insurers together with the AIG companies, formed a Joint Defense Group in order to negotiate and settle coverage issues.
The Joint Defense Group retained NERA Economic Consulting (“NERA”) to aid negotiations among the different insurers over their respective contributions to a joint settlement. In that connection, NERA prepared spreadsheets with figures attributing dollar amounts to specific insurers and policies relating to Dresser’s coverage. The parties dispute the significance of these spreadsheets and NERA’s overall role. Clearwater contends that NERA provided a model which substantively analyzed and calculated each insurer’s liability based on its exposure and possible coverage defenses. Lexington argues that NERA’s data was only to assist the Joint Defense Group in determining the overall contribution that each carrier would make for purposes of a settlement offer to Dresser and was never intended as a substantive analysis or breakdown. This dispute, however, is not material to resolution of the motions before this Court.
In early May 2004, the Joint Defense Group, including AIG, reached an agreement in principle on a global settlement with a net present value totaling $624,984,393 ($742,556,502 payable over six years). AIG’s share had a net present value of $173.6 million. Because AIG wished to spread its payments to Dresser over ten years instead of six, it entered into its own settlement agreement with Dresser apart from others in the Joint Defense Group in order to allow it to do that. The net present value of its contribution to the settlement, however, remained unchanged.
AIG then proceeded to allocate its contribution among its constituent companies’ policies using the “Bathtub Methodology.” Under the Bathtub Methodology, the policies are metaphorically stacked in a bathtub according to their excess layer, while the liability—represented by water—is poured into the tub. Any policies that are “underwater” are paid out to their limit and policies that are “dry” are not implicated. In AIG’s allocation, both of the Lexington Policies fell beneath the “waterline” and thus, under this allocation, Lexington was liable for the full limits of the Lexington Policies, totaling $20,000,000.
Based on this allocation, Lexington paid the full limits under the Lexington Policies between June 2008 and June 2010. As a result, Lexington billed Clearwa-ter for the full $1,000,000 limit of each of the Skandia Certificates. Clearwater has refused to pay. Lexington now seeks to recover on its Skandia Certificates for their full limits.
DISCUSSION
The dispute between the parties is a fairly narrow one. Clearwater does not challenge the reasonableness of the Joint Defense Group’s settlement with Dresser or AIG’s contribution to it. Nor does it question that the losses were within the coverage of the insurance policies from which payment to Dresser was made. Finally, it does not dispute that, under the Bathtub Methodology, Lexington was required to pay—and did in fact pay—the full policy limits under the two Policies. The disagreement centers on how AIG should have allocated its share of the loss among its different policies. Clearwater contends that it should have done so according to the spreadsheets prepared by NERA and that if that were done, the Lexington Policies would not have been exhausted.
The short answer to Clearwater’s challenge is that the Skandia Certificates can be reasonably interpreted as including a “follow the fortunes” or “follow the settlements” provision.[2] As Judge Gertner explained it in Commercial Union Ins. Co. v. Seven Provinces Ins. Co., 9 F.Sup.2d 49, 66 (D.Mass. 1998), the doctrine “requires the reinsurer to cover settlements made by the reinsured, so long as they are not fraudulent, collusive or made in bad faith.” It is a burden shifting mechanism which places a high burden on the rein-surer to show essentially gross negligence or recklessness on the part of the reinsured. This deference to the reinsured’s own allocation of loss maximizes coverage, encourages settlement, and prevents courts from second-guessing the highly factual information which informs these decisions. See, e.g., Travelers Cas. & Sur. Co. v. Insurance Co. of N. Am., 609 F.3d 143, 157-58 (3d Cir. 2010). What it means in the instant case is that, whatever the pre-settlement analysis by NERA was, the post-settlement allocation of loss by AIG is what is important. So long as there is no *521 evidence to suggest gross negligence or bad faith in the allocation, it is controlling.
Although no Massachusetts appellate court has specifically addressed the doctrine in the context of a Massachusetts contract,[3] courts in many other jurisdictions have adhered to the doctrine, citing the strong policy reasons behind it. Some courts have focused on the wording of the reinsurance contract, but have been generous in reading contractual language in a way which incorporates the doctrine. See, e.g., North River Ins. Co. v. ACE Am. Reinsurance Co., 361 F.3d 134, 137 (2d Cir. 2004) (containing a provision stating that the “liability of the Reinsurer . . . shall follow that of the Company”). Some courts have determined that the doctrine applies unless the contract has specifically disavowed it. See, e.g., ReliaStar Life Ins. Co. v. IOA Re, Inc., 303 F.3d 874, 881 (8th Cir. 2002); see also Aetna Cas. & Sur. Co. v. Home Ins. Co., 882 F.Sup. 1328, 1349-50 (S.D.N.Y. 1995) (because doctrine is customary in the industry, it applies even in the absence of a specific clause). As the Second Circuit noted in Travelers Cas. & Sur. Co. v. Gerling Global Reinsurance Corp. of N. Am., 419 F.3d 181 (2nd Cir. 2005), the reinsurance contract is important in defining what losses are covered; it does not limit the ceding company in choosing among several possible allocation methods to determine which policies that covered the loss should contribute to the settlement. Indeed, it is difficult to imagine how reinsurance transactions could function in the absence of the doctrine, since otherwise, the reinsured could not make a good faith judgment regarding allocation of a settlement without being faced with litigation from its reinsurers.
This Court finds particularly instructive the case of North River Ins. Co. v. ACE Am. Reinsurance Co., 361 F.3d 134 (2nd Cir. 2004), which involved a fact pattern remarkably similar to that before this Court. In that case, North River provided certain excess layers of coverage to Owens Coming Fiberglass, another manufacturer of asbestos-related products. The defendant ACE provided facultative reinsurance contracts to North River, with a provision remarkably similar to that provision in the Skandia Certificates that Lexington contends is a “follow the settlements” clause. Like Dresser, Owens Coming Instituted legal proceedings to determine its insurance coverage and eventually there was a settlement. In reaching that settlement, North River had conducted an analysis of possible outcomes if the dispute were litigated to a conclusion, similar to the kind of analysis Clearwater claims that NERA made. North River then sought indemnification from its reinsurers, allocating the losses by the same “bathtub methodology” that AIG used here. ACE refused to pay, noting that in the pre-settlement analysis, the risk of loss was placed on higher layers of the “coverage tower.”
In affirming the lower court’s decision for North River, the Second Circuit held that ACE’s right to second-guess North River’s allocation decisions was limited by the doctrine of “follow the settlements,” which insulates liability determinations from challenge by a reinsurer unless they are fraudulent or in bad faith. “Requiring post-settlement allocation to match pre-settlement analysis would permit a reinsurer, and require the courts, to intensely scrutinize the specific factual information informing settlement negotiations and would undermine the certainty that the general application of the doctrine to settlement decisions creates.” 361 F.3d at 141. Applying that same reasoning to the instant case, this Court concludes that Clearwater should not be able to second-guess AIG’s allocation decision unless it is otherwise unreasonable and made in bad faith. The mere inconsistency between the NERA analysis and AIG’s ultimate decision is not enough. Given the total absence of any evidence of bad faith here, AIG’s allocation governs and the Lexington policies were properly paid in full, triggering Clearwater’s obligation to pay its share.
CONCLUSION AND ORDER
For the foregoing reasons, Lexington’s Motion for Summary Judgment is ALLOWED and Clearwater’s Motion for Summary Judgment is DENIED. It is therefore ORDERED that judgment enter in favor of Lexington requiring Clearwater to pay the full amount billed by Lexington to date under the two Skandia Certificates. The parties shall submit a proposed order of judgment.

Dresser filed for bankruptcy on December 16, 2003.

Although some commentators have drawn a distinction between “follow the settlements” and “follow the fortunes,” most courts have used the phrases interchangeably to describe the same doctrine.

Two Superior Court decisions have addressed the doctrine. Commercial Union Ins. Co. v. Lexington Ins. Co., 2000 Mass.Super. LEXIS 297 (2000); Lexington Ins. Co. v. Prudential Reinsurance Co. of Am., 1997 Mass.Super. LEXIS 593 (1997).