[PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 21-11774

_____

PUBLIC RISK MANAGEMENT OF FLORIDA,

Plaintiff-Counter Defendant-Appellant,

*versus*

MUNICH REINSURANCE AMERICA, INC.,
a foreign corporation authorized to do business in Florida,

Defendant-Counter Claimant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

D.C. Docket No. 8:18-cv-01449-MSS-AEP

_____

Before JILL PRYOR, GRANT, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

Public Risk Management of Florida ("PRM") is appealing the district court's grant of summary judgment to Munich Reinsurance America, Inc. ("Munich"). PRM sued Munich for breach of contract and sought declaratory relief that Munich is obligated by the parties' reinsurance agreement ("the Reinsurance Agreement") to reimburse PRM for the defense and coverage it provided to an insured in an underlying lawsuit. Munich counter-claimed for a declaratory judgment stating that it has no duty to reimburse PRM, and the district court granted that relief. On appeal, PRM argues, *inter alia*, that the Reinsurance Agreement contained a "follow the fortunes" clause, which forbids a reinsurer "from second guessing" an insurer's "good faith decision" to pay a claim to the insured. *Am. Bankers Ins. Co. of Fla. v. Nw. Nat'l Ins. Co.*, 198 F.3d 1332, 1335 (11th Cir. 1999). Alternatively, PRM argues that even if the Reinsurance Agreement did not have a follow-the-fortunes clause, the district court should have inferred one.

We disagree with both arguments. The Reinsurance Agreement contains language that is plainly inconsistent with the follow-the-fortunes doctrine. Accordingly, the district court properly rejected the doctrine's application in this case. We also hold that this Court will not infer application of the follow-the-fortunes doctrine in a reinsurance agreement where the agreement's plain and

unambiguous language is inconsistent with the doctrine.  Applying this rule, we conclude that it would be inconsistent with the plain, unambiguous terms of the Reinsurance Agreement to infer that Munich should be bound by PRM's coverage decision, and, accordingly, we cannot conclude that the district court erred by granting summary judgment and declaratory relief to Munich.

## I.

PRM is a self-insured intergovernmental risk-management program that exclusively insures various local governmental entities in Florida.  One of its members, the City of St. Pete Beach ("the City"), was insured by PRM from April 1, 2008 to April 1, 2009 under the relevant coverage document ("the 2008/2009 Coverage Document").  The Reinsurance Agreement between Munich and PRM reinsured that 2008/2009 Coverage Document.  Both PRM's 2008/2009 Coverage Document and Munich's Reinsurance Agreement lasted from April 1, 2008 to April 1, 2009.[1]  Munich reinsured, *inter alia*, the Public Officials Errors and Omissions ("E&O") Coverage that the 2008/2009 Coverage Document provided to the City.    Prior to April 1, 2008, a different reinsurer, Certain

---

[1] In other words, PRM insured the City pursuant to the 2008/2009 Coverage Document, and Munich's Reinsurance Agreement with PRM agreed to reimburse PRM for amounts PRM paid out to the City which were covered by the 2008/2009 Coverage Document.  Stated more simply, Munich reinsured the 2008/2009 Coverage Document, agreeing to pay PRM amounts PRM paid out to the City if such amounts were covered under PRM's 2008/2009 Coverage Document with the City.

Underwriters at Lloyd's, London ("Underwriters"), issued reinsurance policies to PRM, one of which was effective October 1, 2005 to October 1, 2006.

The 2008/2009 Coverage Document became relevant in this case when two residents sued the City.  Chester and Katherine Chmielewski ("the Chmielewskis") owned a house (pursuant to a 1972 deed) and adjoining beach parcel (pursuant to a 1975 deed). On April 26, 2006, they brought a quiet title action against the City in state court and sought a declaratory judgment that their beach parcel deed was valid.  The state court entered a Stipulated Final Judgment in favor of the Chmielewskis on November 26, 2008 and quieted title to the beach parcel.  The City, however, continued allowing public access to that land and publicly took the position that the Chmielewskis had no right to exclude the public from their beach parcel.

On November 9, 2009, the Chmielewskis sued the City again in state court, alleging two counts of inverse condemnation. PRM denied coverage for this suit because the 2008/2009 Coverage Document excluded liability for inverse condemnation claims.

In this state court litigation, the Chmielewskis filed a second amended complaint on November 18, 2013, asserting two new counts: (1) a § 1983 claim that the City violated their Fourth Amendment rights and (2) an inverse condemnation claim under the Florida Constitution.  The City removed the suit to federal court and gave PRM notice of the second amended complaint. PRM said it would cover the § 1983 claim under its Public Officials

E&O Coverage, but the inverse condemnation exclusion barred coverage for the second claim. PRM notified Munich of the § 1983 claim against the City on December 13, 2013.

On January 13, 2014, Munich sent PRM a letter denying coverage for the § 1983 claim because it arose from wrongful acts that predated the Reinsurance Agreement's coverage period (*i.e.*, April 1, 2008 to April 1, 2009). Munich encouraged PRM to seek coverage from Underwriters because it believed the wrongful acts underlying the § 1983 claim arose during the period when Underwriters reinsured PRM's policy with the City. PRM notified Underwriters of the Chmielewskis' claim and told Underwriters that it believed the wrongful acts underlying the claim occurred during the coverage period of its reinsurance agreement with Underwriters. In a June 15, 2015 letter to the City, PRM used a December 31, 2005 date of loss and informed the City that it was seeking reinsurance coverage from Underwriters. After some back and forth with PRM, Underwriters eventually denied coverage as to the § 1983 claim on October 7, 2015, shortly before the jury trial in the underlying litigation.

The jury awarded the Chmielewskis $725,000 for the § 1983 claim and almost $1.5 million for the inverse condemnation claim. The City filed a motion to set aside $600,000 of the jury's award for the § 1983 claim as duplicative of the damages awarded for the inverse condemnation claim. The judge granted that motion, and judgment on the § 1983 claim was entered as follows: $50,000 for interference with Chester Chmielewski's possessory interest in his

property and $75,000 for interference with Katherine Chmielewski's possessory interest in her property.  PRM agreed to indemnify the City for the § 1983 claim.

On October 28, 2015, PRM contacted Munich to request that it reconsider its denial of coverage.  PRM argued that, in light of evidence and testimony brought out at trial, the date of loss was November 28, 2008,[2] which was within the coverage period of Munich's Reinsurance Agreement with PRM.  This was the first time since Munich denied coverage on January 13, 2014 that PRM notified Munich of developments in the underlying litigation.  On March 3, 2016, Munich again denied coverage, maintaining that "the testimony relevant to the [§ 1983] claim revealed that [the Chmielewskis'] damages for interference with property rights had been ongoing since 2005, and possibly earlier."  While the City's appeal of the jury verdict was pending, PRM settled the § 1983 claim for $750,000.

After PRM settled the § 1983 claim, Munich refused to reimburse PRM.  PRM then sued Munich for reimbursement pursuant to the Reinsurance Agreement.  In its amended complaint, PRM asserted    two    counts    for    breach    of    contract    and    sought

---

[2] It is unclear why PRM argued that the date of loss was November 28, 2008 given that the state court's Stipulated Final Judgment quieting title to the Chmielewskis' beach parcel was entered on November 26, 2008.  That said, this two-day discrepancy is not material to our resolution of this appeal.

reimbursement of its legal defense costs in excess of $200,000,[3] including the cost of the $750,000 settlement.  That is, PRM sought declaratory relief that Munich had a duty under the 2008/2009 Coverage Document and the Reinsurance Agreement to reimburse PRM for the cost of its legal defense of the City and its $750,000 settlement with the Chmielewskis.  Munich answered and counter-claimed for an opposing declaratory judgment that it did not owe PRM any reimbursement for PRM's payments to the City.  The parties then submitted motions for summary judgment.  The district court referred these summary judgment motions to a magistrate judge for the entry of a report and recommendation ("R&R").

The magistrate judge recommended granting summary judgment and declaratory relief to Munich.  He concluded that "[t]he record in the Underlying Litigation [was] replete with references to actions taken by the City prior to April 1, 2008, the effective date of the [2008/2009] Coverage Document and the Reinsurance Agreement, that interfered with the Chmielewskis possessory interest in their property."  The magistrate judge relied on three parts of the record revealing these facts: (a) the Chmielewskis' second amended complaint, (b) portions of the trial transcript, and

---

[3] PRM had a self-insured retention of $200,000.  As stated in the Reinsurance Agreement, "PRM shall retain and be liable for the first $200,000 Ultimate Net Loss . . . . [Munich] shall then be liable for the amount by which such Ultimate Net Loss exceeds the retention of PRM . . . ."

(c) the trial court's denial of the City's post-verdict motion for judgment as a matter of law. These portions of the record "contain[ed] allegations spanning years before the [November 26, 2008] Stipulated Final Judgment," which PRM argued was the date of the occurrence underlying the Chmielewskis' § 1983 claim. Based on the plain text of the 2008/2009 Coverage Document and the Reinsurance Agreement between Munich and PRM, the magistrate judge reasoned,

> [T]he [2008/2009] Coverage Document states that, when there are a series of related wrongful acts by a member, they will be deemed one wrongful act that occurred at the time of the first of such acts. . . . Given that the City's wrongful acts against the Chmielewskis constitute a series of related wrongful acts, under the plain language of the Public Officials E&O coverage, those wrongful acts must "be deemed to have been committed at the time of the first of such acts or alleged acts." . . . [T]he City first committed the wrongful acts during a timeframe predating the [2008/2009] Coverage Document and the Reinsurance Agreement . . . .

PRM objected to the magistrate judge's R&R. The district court disagreed and adopted the R&R. PRM now appeals the district court's grant of summary judgment and declaratory relief to Munich.

## II.

We review a district court's grant of summary judgment *de novo*, applying the same legal standards used by the district court. *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1311 (11th Cir. 2018). "Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Jurich v. Compass Marine, Inc.*, 764 F.3d 1302, 1304 (11th Cir. 2014). We view "all facts and reasonable inferences in the light most favorable to the nonmoving party." *Id.*

The parties agree that Florida insurance law applies to this diversity action. "It is well settled that the construction of an insurance policy is a question of law for the court." *Jones v. Utica Mut. Ins. Co.*, 463 So. 2d 1153, 1157 (Fla. 1985). "Under Florida law, insurance contracts are construed according to their plain meaning. Ambiguities are construed against the insurer and in favor of coverage." *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005). However, before resolving an ambiguity in favor of the insured, we must find "a genuine inconsistency, uncertainty, or ambiguity in meaning . . . after resort to the ordinary rules of construction." *Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So. 2d 938, 942 (Fla. 1979). "[This rule] does not allow courts to rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." *Id.* "Florida law places on the insured the burden of proving that a

10                    Opinion of the Court                    21-11774

claim against it is covered by the insurance policy." *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1516 (11th Cir. 1997).

### III.

We agree with the district court that Munich had no duty to reimburse PRM for its defense and indemnification of the City based on the plain, unambiguous text of the Reinsurance Agreement and the 2008/2009 Coverage Document. The following provisions of the Reinsurance Agreement are crucial to an understanding of this case.

Article I of the Reinsurance Agreement requires Munich to indemnify PRM for "Ultimate Net Loss" that PRM has paid pursuant the 2008/2009 Coverage Document:

> The Reinsurer agrees to indemnify PRM, on an excess of loss basis, for Ultimate Net Loss paid by PRM as a result of Occurrences . . . during the term of this Agreement under PRM's Coverage Document underwritten by PRM and covered under this Agreement.

Art. I. Article VII then defines "Ultimate Net Loss" as "the sum or sums paid by PRM for which it is liable, under the Coverage Document reinsured hereunder." Under Article XI(C), Munich must pay PRM after it receives from PRM proof of payment and coverage:

> Payment by the Reinsurer of its portion of loss and expense, paid by or on behalf of PRM, will be made by the Reinsurer to PRM promptly after proof of

payment by PRM and coverage hereunder is received
by the Reinsurer.

Art. XI(C).

To summarize, the Reinsurance Agreement requires Munich to reimburse PRM after PRM submits: (1) proof that it has paid amounts to its insured (*i.e.*, the City), and (2) proof that Munich's Reinsurance Agreement provides coverage for such payment. Because the Reinsurance Agreement covers only "sums paid by PRM for which it is liable, under the Coverage Document reinsured hereunder," *i.e.*, the 2008/2009 Coverage Document, Munich is not obligated to reimburse PRM for amounts it paid on behalf of the City—either as indemnification or for its legal defense—that PRM was not required to pay under the 2008/2009 Coverage Document. For example, Munich is not obligated to reimburse PRM for amounts it paid on behalf of the City for which it might have been liable pursuant to coverage documents preceding the 2008/2009 Coverage Document that might have been reinsured by reinsurance companies other than Munich.

Accordingly, this case turns on whether the 2008/2009 Coverage Document (which Munich reinsured) required PRM (a) to defend the City against the § 1983 claim in the Chmielewskis' second amended complaint and (b) to indemnify the City for the $750,000 settlement of that claim. The answer to both questions is clearly no.

As the parties here agree, the 2008/2009 Coverage Document's Public Officials E&O Coverage provides occurrence-based

(as opposed to claims-made) coverage. "An occurrence policy is a policy in which the coverage is effective if the [wrongful] act or omission occurs within the policy period, regardless of . . . the date the claim is made or asserted." *Gulf Ins. Co. v. Dolan, Fertig & Curtis*, 433 So. 2d 512, 514 (Fla. 1983). In other words, "[c]overage depends on when the [wrongful] act or omission occurred and not when the claim was asserted." *Id.* at 515. Therefore, whether the 2008/2009 Coverage Document obligated PRM to defend and indemnify the City depends on *when* the wrongful acts (*i.e.*, the occurrence) underlying the Chmielewskis' § 1983 claim occurred.

The following provisions of the 2008/2009 Coverage Document are crucial to an understanding of whether PRM was required to defend and indemnify the City pursuant to the 2008/2009 Coverage Document. The 2008/2009 Coverage Document's Public Officials E&O Coverage defines "occurrence" as follows:

> 1. **OCCURRENCE** means a **WRONGFUL ACT** committed during the **COVERAGE PERIOD**. All claims for damages based on or arising out of the same **WRONGFUL ACT** or a series of related **WRONGFUL ACTS** by one or more **MEMBERS** shall be deemed one **OCCURRENCE**. . . .
>
> 2. For the purposes of this [Public Officials E&O policy] only, **WRONGFUL ACT** means any actual or alleged . . . discrimination and violations of civil rights by the **MEMBER** during the **COVERAGE PERIOD**. All claims for damages

> based on or arising out of the same **WRONGFUL ACT** or a series of related **WRONGFUL ACTS** by one or more **MEMBERS** shall be deemed one **WRONGFUL ACT**. . . .

Put simply, these definitions treat a series of related wrongful acts as one "occurrence." The Public Officials E&O Coverage then fixes the date of that one occurrence as the date of the first wrongful act in the series of related wrongful acts:

> This coverage applies only if a claim for damages arises out of a **WRONGFUL ACT** committed during the **COVERAGE PERIOD**. As respects a series of related **WRONGFUL ACTS** by one or more **MEMBERS**, the **WRONGFUL ACT** shall be deemed to have been committed at the time of the first of such acts or alleged acts.

The Public Officials E&O Coverage only covers that occurrence if it fell within the 2008/2009 Coverage Document's coverage period—*i.e.*, April 1, 2008 to April 1, 2009:

> This coverage does not apply to **WRONGFUL ACTS** committed prior to or after the **COVERAGE PERIOD**, however as respects a series of related **WRONGFUL ACTS** by one or more **MEMBERS** taking place over more than one **COVERAGE PERIOD**, the **WRONGFUL ACT** shall be deemed to have been committed during the first **COVERAGE PERIOD** in which the first of such acts or alleged acts took place and only that Coverage Document's **EXCESS LIMIT**

**OF COVERAGE** and **SELF INSURED RETENTION** shall apply.

Based on the plain, unambiguous language of the 2008/2009 Coverage Document, PRM had neither (a) a duty to defend the City against the § 1983 claim in the Chmielewskis' second amended complaint nor (b) a duty to indemnify the City for the $750,000 settlement of that claim. These issues are related, but the two duties are "distinct." *Irvine v. Prudential Prop. & Cas. Ins. Co.*, 630 So. 2d 579, 580 (Fla. Dist. Ct. App. 1993). "While the duty to defend is broad and based on the allegations in the complaint, the duty to indemnify is determined by the facts adduced at trial or during discovery." *Pa. Lumbermens Mut. Ins. Co. v. Ind. Lumbermens Mut. Ins. Co.*, 43 So. 3d 182, 188 (Fla. Dist. Ct. App. 2010). "The duty to defend is of greater breadth than the insurer's duty to indemnify, and the insurer must defend even if the allegations in the complaint are factually incorrect or meritless." *Jones v. Fla. Ins. Guar. Ass'n, Inc.*, 908 So. 2d 435, 443 (Fla. 2005) (per curiam).

A.    Duty to Defend

We will start with the duty to defend. Whether PRM had a duty to defend the City "must be determined from the allegations in the" Chmielewskis' second amended complaint. *Id.* If those allegations "fairly and potentially" brought the § 1983 claim within the 2008/2009 Coverage Document's coverage period, then PRM had a duty to defend. *Id.* The § 1983 claim was based on the City's seizure of the Chmielewskis' property in violation of the Fourth Amendment. *See United States v. Jacobsen*, 466 U.S. 109, 113, 104

S. Ct. 1652, 1656 (1984) ("A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property."). Accordingly, we must look to the second amended complaint to determine when that seizure allegedly occurred.

The Chmielewskis' second amended complaint alleged that the City interfered with their possessory interests in their property beginning in 2003. They alleged that the City adopted an ordinance in 2003 that designated their beach parcel as "public" property, and, "[a]s a result, public use of [their property] increased and [their] property was constantly traveled by members of the public with various degrees of noise, litter, injury to the dunes and plants, pet waste, and invasive prying and peering directly into the Chmielewskis' home through their great room window." The Chmielewskis also alleged that they tried to sell their property in 2005, but the City denied them density credits for the beach parcel because the City asserted that they "did not own" that parcel. They then alleged that the City continued to infringe upon their possessory interests in their property throughout the following four years.

PRM does not dispute that (a) the Chmielewskis' second amended complaint alleged that Fourth Amendment violations occurred as early as 2003 (*i.e.*, prior to the relevant coverage period) or (b) every infringement by the City of the Chmielewskis' possessory interest in their property was part of a series of related wrongful acts. Our own review of the allegations in the second amended complaint confirms the opinions of the magistrate judge and the

district court—*i.e.*, there are ample allegations of related wrongful acts of the City interfering with the Chmielewskis' possessory interest in their property beginning well before 2008.

The 2008/2009 Coverage Document treats this series of related Fourth Amendment violations as a single "occurrence" that took place "at the time of the first of such acts." Accordingly, the occurrence underlying the § 1983 claim occurred, at the earliest, in 2003 or, at the latest, in 2005. Both dates are well before the 2008/2009 Coverage Document's coverage period.[4] Based on these allegations in the second amended complaint, PRM had no duty to defend the City under the 2008/2009 Coverage Document.[5]

---

[4] PRM notes on appeal that "[t]he Second Amended Complaint is replete with factual allegations that the City interfered with the Chmielewskis' possessory interest in their beach parcel" after "the November 26, 2008 quiet title final judgment." But because those alleged wrongful acts were part of a series of related wrongful acts, the 2008/2009 Coverage Document treats them as "one occurrence" that was "committed at the time of the first of such acts." Moreover, even if the series of related wrongful acts "[took] place over more than one **COVERAGE PERIOD**, the **WRONGFUL ACT** shall be deemed to have been committed during the first **COVERAGE PERIOD** in which the first of such acts or alleged acts took place." The series of related wrongful acts underlying the Chmielewskis' § 1983 claim occurred prior to the 2008/2009 Coverage Document's coverage period, so Munich owed no duty to reimburse PRM because it only reinsured that coverage document.

[5] PRM asserts that the district court "ignored" the legal principle that "[t]he merits of the underlying suit have no bearing on whether the duty to defend is owed" because the duty to defend is determined based on the allegations in

PRM argues that Munich "admitted" that PRM owed a duty to defend the City.  PRM's basis for this claim is that Munich's "corporate representative, Christopher Duffy, . . . testified that [PRM] owed a duty to defend the City in the underlying case, *and* that its duty to defend obligation continued throughout the litigation until the claim was finally resolved."  But this mischaracterizes Duffy's testimony.  The magistrate judge noted that Duffy "agreed that PRM owed a duty to defend regardless of which coverage period the underlying lawsuit fell under, based on the allegations contained within [the § 1983 claim] of the [second amended complaint]."  In other words, Duffy acknowledged that PRM may have had a duty to defend the City pursuant to a prior coverage document, but that duty was not owed under the 2008/2009 Coverage Document.

PRM's own actions prove this point.  At one point, PRM told the City that (i) its date of loss was December 31, 2005, and (ii) it was seeking reinsurance coverage from Underwriters—not

---

the second amended complaint.  That is not true.  The district court correctly looked to the second amended complaint: "because the allegations in the operative complaint identified wrongful acts that took place before the policy period, PRM did not owe the City a duty to defend the underlying lawsuit."  The magistrate judge also quoted the second amended complaint at length to show that the series of related Fourth Amendment violations allegedly began as early as 2003.  Both judges properly concluded that PRM owed no duty to defend the City based on the second amended complaint's allegations, which did not "fairly and potentially bring the [§ 1983 claim] within policy coverage."  *Jones*, 908 So. 2d at 443.

Munich.  After Munich denied coverage, PRM's claims litigation manager told Underwriters that PRM believed the wrongful acts underlying the § 1983 claim occurred during the coverage period of its reinsurance agreement with Underwriters.  Accordingly, when PRM defended the City at trial from October 19–23, 2015, it likely did so with the understanding that the § 1983 claim was covered by an earlier coverage document, not the 2008/2009 Coverage Document.  PRM did not re-seek reinsurance coverage from Munich until October 28, 2015—*i.e.*, not until after trial in the underlying case.  These facts suggest that PRM defended the City pursuant to an earlier coverage document—one that Munich had not reinsured.

PRM also argues that the Reinsurance Agreement's definition of "occurrence" means that the § 1983 claim fell within the 2008/2009 Coverage Document's coverage period.  In its definition of "occurrence," the Reinsurance Agreement says, "If the date of any loss occurring under PRM's Coverage Document cannot be specifically determined, the date of loss shall be the inception date of the Coverage Document."  PRM argues that because the date of loss is unclear (*i.e.*, the first wrongful Fourth Amendment violation occurred at some unspecified time between 2003 and 2005), then the Reinsurance Agreement resolves this lack of clarity by fixing the date as April 1, 2008.  But PRM misreads the Reinsurance Agreement: it says the date of loss will be April 1, 2008 if the loss "occur[s] under PRM's Coverage Document" and if the date of that loss "cannot be specifically determined."  In other words, the

Reinsurance Agreement will insert April 1, 2008 as the date of loss *if* the occurrence falls within the 2008/2009 Coverage Document's coverage period and occurred on an unspecified date. Here, that is not the case: the loss underlying the § 1983 claim occurred prior to the coverage period.

PRM's interpretation is inconsistent with the plain meaning of this provision of the Reinsurance Agreement: the April 1, 2008 date of loss applies only once it has been established that the loss fell within the 2008/2009 Coverage Document. Without that predicate finding, the Reinsurance Agreement does not fix the date of any loss as the first day of its coverage period.

B.    Duty to Indemnify

PRM also did not have a duty to indemnify the City for the $750,000 settlement of the § 1983 claim. Unlike the duty to defend, "the duty to indemnify is determined by the facts adduced at trial or during discovery." *Pa. Lumbermens Mut. Ins. Co.*, 43 So. 3d at 188. Those facts, like the allegations in the second amended complaint, show that the earliest of the related series of wrongful acts by the City began well before the 2008/2009 Coverage Document's coverage period. As noted by the magistrate judge,

> Mrs. Chmielewski testified that she had not been able to enjoy her property since the Don Vista Center renovation [which occurred from 2003 to 2005], as she experienced reduced privacy when foot traffic in front of her home increased and beachgoers would often look into her windows. Her sons similarly testified

that the renovation of the Don Vista Center in the early 2000s invited public visitors to traverse his parents' property by clearing the overgrowth from his family's sidewalk, that they had to listen to their parents complain about the issue since 2004 or 2005 and discuss the issue virtually every day for 10 years, that the Chmielewskis' property began to resemble a "zoo" or "circus," and the neighborhood became "like a carnival" starting around the early 2000s.

The Chmielewskis' counsel noted at trial that the City used federal grant money from 2003 to 2005 to renovate the Don Vista Center, and he argued, "[T]hat's when our problems intensify. That's when we begin having issues leading to this case." The trial court agreed: when it denied the City's post-verdict motion for judgment as a matter of law, it said the Chmielewskis had "presented substantial evidence" that the City infringed on their property rights beginning as early as the renovation of the Don Vista Center.

Like the allegations in the second amended complaint, the facts adduced at trial show that the earliest Fourth Amendment violation underlying the § 1983 claim occurred well before the 2008/2009 Coverage Document's coverage period. Because the series of Fourth Amendment violations are related, the magistrate judge and district court rightly considered them to be a single occurrence that occurred as early as 2003.

Munich agreed to indemnify PRM for "Ultimate Net Loss," which is "the sum or sums paid by PRM for which it is liable, under the [2008/2009] Coverage Document." PRM did not incur any

"Ultimate Net Loss" because it was not "liable" for the costs of defending and indemnifying the City pursuant to the 2008/2009 Coverage Document.  If PRM was not liable to defend or indemnify the City under that coverage document, then any costs it incurred are not "Ultimate Net Loss," so Munich has no duty to reimburse it under the Reinsurance Agreement.  Accordingly, the district court did not err by granting summary judgment and declaratory relief to Munich.

C.    PRM's Argument that the Date of Loss was November 26, 2008.

PRM makes one final argument in its attempt to locate the date of loss within the 2008/2009 Coverage Document.  PRM argues that the district court erred in concluding that the Fourth Amendment violations underlying the § 1983 claim occurred prior to April 1, 2008 because, PRM argues, the City could have violated the Chmielewskis' Fourth Amendment rights only after the state court entered its Stipulated Final Judgment in the Chmielewskis' quiet title action on November 26, 2008.  PRM's argument is that the Chmielewskis did not have a possessory interest in the beach lot until the state court entered its judgment quieting their title to that parcel.  Accordingly, PRM argues, the first act in the series of related wrongs must have occurred immediately after their possessory interest arose on November 26, 2008—*i.e.*, within the coverage period of the 2008/2009 Coverage Document.

We agree with the magistrate judge and district court that this argument is wholly without merit.  PRM's contention hinges

on the premise that one cannot bring a Fourth Amendment claim for seizure of one's property until after a court has acknowledged one's possessory interest in that property in a quiet title action. PRM cannot cite a single case for this proposition.

Under the Fourth Amendment, "[a] 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *Jacobsen*, 466 U.S. at 113, 104 S. Ct. at 1656. No caselaw suggests that the Chmielewskis' possessory interests in their property only come into being once they succeeded in their quiet title suit. As the magistrate judge concluded, the state court's Stipulated Final Judgment "provided clear *evidence* of the enforceability of [the Chmielewskis'] possessory interests, but [it] did not *establish* their possessory interests." Therefore, the Chmielewskis could have brought their § 1983 claim for Fourth Amendment violations that occurred prior to November 26, 2008. The series of related wrongful acts underlying their claim did occur in fact before the 2008/2009 Coverage Document's coverage period.

D.    Summary

For the foregoing reasons, we conclude that the plain, unambiguous language of the relevant insurance provisions clearly demonstrate that the insured occurrence occurred prior to the effective date of the 2008/2009 Coverage Document and the Reinsurance Agreement. The allegations of the second amended complaint clearly demonstrate that PRM had no duty to defend the City under the 2008/2009 Coverage Document, and the facts developed

21-11774              Opinion of the Court              23

in the trial of the underlying case clearly demonstrate that PRM had no duty to indemnify the City under the 2008/2009 Coverage Document. Thus, the occurrence was not covered under Munich's Reinsurance Agreement.

## IV.

PRM's main argument on appeal is that the district court erred by reviewing *de novo* its decision to cover the Chmielewskis' § 1983 claim because the follow-the-fortunes doctrine requires Munich to reimburse PRM for its good faith decision to defend and indemnify the City. This doctrine holds "that reinsurers are generally bound by the reinsured's decision to pay the claim and must refrain from second guessing a good faith decision to do so." *Am. Bankers*, 198 F.3d at 1335. As this Court has explained, the case law cites several policy reasons supporting the doctrine. First, "[r]einsurers do not examine risks, receive notice of loss from the original insured, or investigate claims," so "the reinsurance market has relied on . . . the exercise of utmost good faith to decrease monitoring costs and ex ante contracting costs" because reinsurers "cannot duplicate the costly but necessary efforts of the primary insurer in evaluating risks and handling claims." *Id.* (quoting *Unigard Sec. Ins. Co., Inc. v. N. River Ins. Co.*, 4 F.3d 1049, 1054 (2d Cir. 1993), *abrogated on other grounds by Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83 (2d Cir. 2021)).

And *American Bankers* notes a second reason for the doctrine:

> To permit the reinsurer to revisit coverage issues re-
> solved between the insurer and its insured would
> place insurers in the untenable position of advancing
> defenses in coverage contests that would be used
> against them by reinsurers seeking to deny cover-
> age. . . . Were the Court to conduct a *de novo* review
> of [the insurer's] decision-making process, the foun-
> dation of the [insurer]-reinsurer relationship would
> be forever damaged.  The goals of maximum cover-
> age and settlement . . . would give way to a prolifera-
> tion of litigation.  [Insurers] faced with *de novo* re-
> view of their claims determinations would ultimately
> litigate every coverage issue before making any at-
> tempt at settlement.

*Id.* (first alteration in original) (quoting *N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1206 (3d Cir. 1995)).

As PRM would have us apply it here, the follow-the-fortunes doctrine would mean that Munich could not second guess PRM's coverage decision to defend and indemnify the City if PRM decided in good faith to do so.  Munich would be bound to reimburse on the basis of PRM's good faith coverage decision.

PRM argues that the Reinsurance Agreement has an express follow-the-fortunes clause, and, in the alternative, argues that we should infer one.  We reject both arguments because the plain, un-ambiguous language of the relevant insurance provisions are in-consistent with the follow-the-fortunes doctrine.

As the foregoing description (*supra* Part III) of the relevant insurance provisions reveals, the relevant insurance provisions in this case not only do not contain an express follow-the-fortunes clause, they are squarely inconsistent with the doctrine. That is, the relevant insurance provisions here expressly require PRM to submit to Munich not only proof that PRM has paid its insured (*i.e.*, the City), but also proof that Munich's Reinsurance Agreement provides coverage for such payment. As noted above, Article XI(C) of the Reinsurance Agreement provides

> Payment by the Reinsurer of its portion of loss and expense, paid by or on behalf of PRM, will be made by the Reinsurer to PRM promptly after *proof of* payment by PRM and *coverage hereunder is received by the Reinsurer.*

Art. XI(C) (emphasis added). Also as noted above, Article I and Article VII of the Reinsurance Agreement similarly make clear that Munich agrees to indemnify PRM only for occurrences which occur during the 2008/2009 Coverage Document that Munich reinsured. In other words, Munich reinsured PRM only for occurrences for which PRM was liable under the 2008/2009 Coverage Document. Thus, Article I of the Reinsurance Agreement provides

> The Reinsurer agrees to indemnify PRM, on an excess of loss basis, for Ultimate Net Loss paid by PRM as a result of Occurrences . . . during the term of this Agreement under PRM's Coverage Document underwritten by PRM and *covered under this Agreement.*

Art. I (emphasis added). And Article VII of the Reinsurance Agreement defines the term Ultimate Net Loss as "the sum or sums paid by PRM *for which it is liable*, under the Coverage Document reinsured hereunder," *i.e.*, the 2008/2009 Coverage Document. Art. VII (emphasis added).

Although PRM argues that Articles I and XI(C) of the Reinsurance Agreement constitute an express follow-the-fortunes clause, the above quotations demonstrate just the opposite. Squarely contrary to providing that Munich will be bound by PRM's good faith coverage decisions—the core principle of the follow-the-fortunes doctrine—these provisions require that PRM must submit proof to Munich not only that PRM has paid amounts to its insured (*i.e.*, the City), but also proof that Munich's Reinsurance Agreement provides coverage for such payments. *See* Art. XI(C) ("Payment by the Reinsurer . . . will be made . . . after proof of payment by PRM and coverage hereunder is received by the Reinsurer.").[6]

Having rejected PRM's argument that the Reinsurance Agreement contains an express follow-the-fortunes clause, we turn

---

[6] PRM inaccurately characterizes the district court's opinion as deciding that Article XI(C) was not a follow-the-fortunes clause "simply because [the reinsurance agreement] did not specifically use the phrase 'follow the fortunes.'" That is incorrect: the district court concluded that Article XI(C) was not a follow-the-fortunes clause because it did not bind Munich to follow PRM's coverage decisions.

to its argument that, even absent an explicit follow-the-fortunes clause in the Reinsurance Agreement, this Court should infer that the doctrine applies to any reinsurance contract under Florida law. In predicting how the Supreme Court of Florida would construe the Reinsurance Agreement, we decline to infer the application of the follow-the-fortunes doctrine under the circumstances of this case. Where a reinsurance agreement contains terms that are plainly and unambiguously inconsistent with the follow-the-fortunes doctrine (as the Reinsurance Agreement does here), we are confident that the Supreme Court of Florida would not infer application of the doctrine. What PRM's argument asks us to do is to infer that PRM and Munich intended for Munich to be bound by PRM's good faith decision to provide coverage for the City's wrongful acts in the underlying case. But the plain, unambiguous language of the Reinsurance Agreement provides just the opposite: it requires that PRM submit to Munich not only proof that it paid the City, but also proof that such payments were covered under the Reinsurance Agreement. We reject PRM's argument as wholly without merit. *See Excelsior Ins. Co.*, 369 So. 2d at 942 (prohibiting courts from "rewrit[ing] contracts, add[ing] meaning that is not present, or otherwise reach[ing] results contrary to the intentions of the parties").

We need not decide—and we expressly do not address—whether such an inference would be appropriate under other circumstances—*e.g.*, where the reinsurance agreement contains neither an express follow-the-fortunes clause nor language that is

plainly inconsistent with the doctrine.  Two treatises suggest that courts are divided over this question.  *See* 2 Allan D. Windt, *Insurance Claims & Disputes: Representation of Insurance Companies & Insureds* § 7:10 (6th ed. Mar. 2022 Update) (stating that "courts in the majority of states" have held that a reinsurer does not have to follow the fortunes of the insurer if their contract does not contain an express follow-the-fortunes clause); Steven C. Schwartz, *Reinsurance Law: An Analytic Approach* § 9.02 (2021) (noting that "[c]ourts are split as to whether a follow-the-fortunes clause is required, or whether the doctrine is implicit in every reinsurance contract").

PRM also argues that our prior decision in *American Bankers* required the district court to apply the follow-the-fortunes doctrine.  We reject that argument.  We applied the doctrine in *American Bankers* because the reinsurance agreement at issue contained a follow-the-fortunes clause.  *See* 198 F.3d at 1334–35 (identifying a clause that said "[a]ll claims involving this reinsurance when settled by the Company, shall be binding on the Reinsurer" as a follow-the-fortunes clause and noting that such clauses "usually state[] that when an insurer loses to—or settles with—the insured, the reinsurer must 'follow the fortunes' of the [insurer] and pay on its reinsurance obligations").  Our decision in *American Bankers* did not hold, or even suggest, that courts must imply the doctrine

in every reinsurance agreement, even when the relevant insurance provisions are inconsistent with an application of the doctrine.[7]

In sum, we reject PRM's arguments that the Reinsurance Agreement contains an express follow-the-fortunes clause and its alternative argument that we should imply one. Both arguments fail because the plain, unambiguous language of the relevant insurance provisions are squarely inconsistent with the core principle of

---

[7] PRM also cites two decisions of the Eighth Circuit for the proposition that courts should imply the follow-the-fortunes doctrine in all reinsurance contracts. We can easily distinguish these cases. In the first one, the Eighth Circuit affirmed the district court's application of the follow-the-fortunes doctrine because (a) the parties agreed "as to the nature of the follow-the-fortunes doctrine and as to its customary application in the reinsurance business" and (b) the contracts at issue "did not contain 'anti-follow-the-fortunes' provisions." *ReliaStar Life Ins. Co. v. IOA Re, Inc.*, 303 F.3d 874, 881 (8th Cir. 2002). The Eighth Circuit, which was applying Minnesota law, did not hold that a silent reinsurance contract implicitly contains a follow-the-fortunes clause even when evidence of the parties' intent is inconsistent with application of the doctrine. *Id.* at 880–81. In the second opinion, the Eighth Circuit expressly did not reach the question of whether such a clause may be implied in a reinsurance contract. *See Emps. Reinsurance Co. v. Mass. Mut. Life Ins. Co.*, 654 F.3d 782, 791 (8th Cir. 2011) ("[W]e express no opinion as to whether follow the settlements is an implied term of the Treaty under Connecticut law."). Neither case suggests that a follow-the-fortunes clause should be implied when the reinsurance agreement contains provisions inconsistent with the follow-the-fortunes doctrine.

the follow-the-fortunes doctrine—*i.e.,* that Munich would be bound by PRM's good faith coverage decisions.[8]

## V.

Because the district court correctly decided that Munich had no duty to reimburse PRM for its defense and indemnification of the City in the underlying § 1983 suit, we **AFFIRM** the grant of summary judgment and declaratory relief in favor of Munich. The judgment of the district court is

**AFFIRMED.**

---

[8] Because we have determined that the district court correctly refused to apply the follow-the-fortunes doctrine, we do not reach the parties' arguments concerning whether a bad faith exception to the doctrine might apply.